Chambers in Little Rock, and I would like to thank you, Judge Wright, for coming all the way from Arkansas to help us decide these cases this week. Thank you. And the first case is, looks like you're ready to go, it's the United States of America versus Samuel Kwushue, and Ms. Will is here for the appellate, Mr. Will Mott for the appellee, and we're ready to proceed. My name is Amy Weil, and I am here representing Samuel Kwushue. As Your Honor has read the brief, our main argument to begin with is the sentencing issue. The district court in this case clearly erred on two levels, two very distinct, very significant as far as Mr. Kwushue's sentence goes. The first is the loss amount. The method in which the district court determined loss amount is pretty incomprehensible when you look at the record and you look at what happened in this case. The court used what is a comparative store methodology, which was complete speculation on the one hand that the other stores were actually even comparable, but also what they came up with had nothing to do with loss in this case. What the court did was it said, oh, there's these other comparable stores that are nearby, like a mile and a half away, three miles away, but they're small stores that sell food stamps. Well, was the court required to use the net loss method? That seems like a more speculative way to arrive at an appropriate figure than the comparable store methodology to me. How would the court do that? Well, actually, Your Honor, it's not speculative because under the net loss theory, which is required, Your Honor asked if they were required. Yes, they're required, and this court has used it before in food stamp cases because it's the government benefit rule, which is a specific rule under 2B1.1, and under that rule you find the net loss, which means you take into account legitimate sales. The comparable store method not only had nothing to do with loss in this case, but it didn't at all, at all take into consideration legitimate sales, and I'd like to point out to the court  What do you mean you say required? It's required to take into account legitimate sales because it's net. It's not just all the EBT transactions that took place at a store, but some of those EBT transactions we absolutely know were legitimate, and the thing that's ironic in this case is of the 12 people that were interviewed, two of them that showed up in the pre-sentence report, both had legitimate sales. All 18 undercover operations all included legitimate sales, and of the sentencing transaction that took, that was described at sentencing, I'm sorry, sorry, the EBT transaction was described at sentencing. That also had a legitimate sale, and in fact, and she, her sale, the biggest thing that So if the court used that method to determine loss, the net loss method, how would it work? Bring in all the customers and have them tell us how much money they got back in return for the use of their cards? Is that how it would work? No, Your Honor. There's several different ways that the courts have determined using the net loss, and I've set forth the different cases in my brief, but one of the ways they could have done it in this case is, one of the ways that would have automatically changed the guidelines was just say a certain percentage of his sales. In this case, what the evidence appeared to be was that he took back 40% and he gave to the customer 60%, and either some of it was food and some of it was money, but if you just took figures and you just said, okay, well, not all of it was bad, and 40% he kept and 60% he didn't keep, and you used the 60% method, he's under $3.5 million. Where do you get the 40% and the 60% just so I'm clear? How do we extrapolate the 40% and 60%? From both evidence of what people said, well, that was the way we normally did it. I mean, normally we'd go in and, you know, that's our setup was he would keep 40%, and that's borne out by the meat sale. I mean, there aren't that many sales in this record. We were relying... Well, your client didn't have very good records either, did he? He had all the bank records the government had, and your Honor points out, yes, we had bank records. That's a different way that the court could have made a determination. Some of these cases, it's hard. I mean, he can't just go, oh, comparable sale, we'll subtract. This is easy. We'll put this in the computer. They actually went through bank records of the person who they were going to be sentencing and said, well, let's look at what really was the net loss. Let's really see what their sales were, and they'd look at how much inventory he had and how much the EBT, and they'd make a comparison. They'd go through bank records. They'd talk to people. They would look at customers. They'd look at, you know, what was being done here. You have, you know, sales happening. Our cases say that all that the court has to do is to make a reasonable estimate of the loss. It doesn't have to be, you know, with precision. You know, we don't require accuracy and precision. All that the court has to do is to just reasonably estimate the loss. And so if we're reviewing this district court's decision for clear error, where's the clear error here? Your Honor, when you make a reasonable estimate, one thing that has to be sure, it can't be speculative and it can't be based on lack of credible, reliable evidence. What's wrong with the, there's several things wrong in this case, what's wrong with the comparable store, it doesn't give you anything. All it tells you is, well, these other stores had EBT transactions, so did you. It doesn't take into account legitimate sales, which is required, and it doesn't really give you a figure that has anything to do with fraud because It didn't just look at the other stores, it examined the SNAP transaction records, it took into consideration the agent's testimony, it took into consideration Mr. Cushu's own application to participate in the program. I mean, the court looked at a lot of other things other than the sales, comparable sales, didn't it? Not in determining loss because, you know, you might have thought about it, oh, I'm going to think about, you know, all these sales and I'm going to think about legitimate sales, but it wasn't factored in. The only thing that was factored in was there were these other stores that were about the same size. It starts off for months, and I would like to point out to your Honor that over a million dollars worth of sales were before those other stores even were in existence or had EBT programs. So they're adding up just Mr. Cushu's sales, and those are also for a three-year period before there was any evidence that he was involved in any fraud because they didn't start their investigation until March of 2015. Wasn't the point, though, of the comparable stores comparison to give Mr. Cushway credit for legitimate sales? I mean, isn't that the idea? Let's find some stores that are not under investigation. I understand the government sort of had a hard time finding stores that weren't under investigation, but let's find some that aren't under investigation, see what their normal EBT sales are, and we'll give Cushway credit for those. But see, it doesn't really mean anything. All that showed is, well, how much business do they have? Mr. Cushway had a bigger store. He was in a different area. But he didn't have much inventory in the store, according to the . . . At the time they came in, no, Your Honor. At the time they came in, there was not much inventory in the store. And he estimated his snap sales to be $25,000 a year, and they, over a four-year period, they were grossly in excess of that. Yes, Your Honor, and we know that he had sales. It wasn't just like he had a front. This comparative store method would have taken into consideration if he did not have a store. And he didn't sell anything out of it, and nobody bought anything. That was what this showed. And you can't come up with a government benefit analysis like that. Well, isn't this really a way to . . . a way, maybe not the way you want, but it is a way to calculate net loss? No, Your Honor, because it doesn't take into consideration any legitimate sales. It was adding up all EBT sales. It didn't have anything to do with legitimate sales. It was taking the other store's legitimate sales and giving him . . . as if he had credit for that amount. No, Your Honor, what they did was they added up all the EBT sales, and they took the average EBT sales, and they said, how many more EBT sales did Mr. Cushway have? Oh, everything over that was fraudulent. Sure. That's what I mean. They were giving him credit for that average. It was not as if they were taking all of the EBT sales and sticking him with it. Yeah, I mean, this is my point. I mean, like, they look at non-fraudster stores. They look at those EBT sales, and they assume, well, let's, you know, let's just give Cushway the credit for what he would have done had he not been a fraudster store, right? They are looking at something that doesn't have anything to do with this case, and it's And the last thing I'll say about it is that this is the kind of analysis you do to see if somebody is engaging in fraud. In fact, this is the analysis they did when they said, oh, we see he's got more EBT sales than any other store, so we're going to go investigate him. That's fine. That is appropriate. That's what you use a comparative store for. But then, instead of digging down and determining what the actual loss was, really was . . . and they said, okay, we're just going to use that. And you can't do that. That's not the way you're supposed to do the analysis. Okay. I'd also like to argue to Your Honor, while I still have time, the other issue of role in the offense. It's very clear that under the law, you are required to show supervisory authority over the other people, and that just didn't exist here. And as was argued before to the district court, the customers who came in the store weren't controlled by him. They just came. Other cases in which the supervisory role has been applied across the board, I still haven't found a different case. Well, the government says that even if you're right, any error was harmless because after awarding the enhancement, the court veered downward four levels and made it clear that it would have issued the same sentence regardless of the role enhancement applicability. That is what they say. But that's not . . . when you read it, that's not what happened. I mean, unfortunately for the prosecutor, he didn't ask that. He didn't say to the judge, well, would you impose the same sentence if you had not made this determination about role or made the variance downward? He didn't say that. Instead, he said, is it fair to say Your Honor would have reached this conclusion regardless of whether the role enhancement are applied or not? Well, this conclusion, what is he talking about? He started talking about a variance, the judge. Judge was saying, I'm going to impose a variance in this case. I'm going to find, and he says, I'm going to find 51 months. And then he goes on to talk for the balance of the paragraph about, you know, you're probably not going to like this and this is not, you know, going to be really great for you, but I'm going to vary. And these are all the reasons I'm going to vary downward. But what about the next sentence? And maybe you'll tell me why I'm misreading this, but he says, the judge says, the main thing I want to stress here is that I just don't think that this four-level enhancement, even though I found it, is something I would sentence him under. Right. So he seems to be saying, like, I'm not going to use it. Right. That's his variance. He's explaining his variance. So my point is that this whole discussion is an explanation of his variance. So when he's asked, regardless, would you have reached this conclusion, how does the judge know what he's talking about? If I had spent six sentences talking about my conclusion about variance and somebody asked me, would you have reached this conclusion, I would have thought he was talking about the variance. I wouldn't have thought about sentence. And it's at least nebulous or ambiguous enough, at a minimum, at a minimum, that it can't be a waiver and show harmless error. And the judge never said he would have sentenced him to 51 months. So our argument in this is that it is required that the judge, and it's important. This is four levels. This isn't even just a two-level. So let me just ask you this about variance, and I'm sure I'm misunderstanding something. But in the sentence that I just read you, you said this is about a four-level enhancement. The judge says, let me just make clear, I'm not applying the four-level enhancement. Right. Right? Oh. No. He's, he was varying downward so that he wouldn't have him be sentenced under that. He found it, which is, I didn't really understand why the judge was doing this, okay? It's not totally clear, but I think it was sort of like, I feel bad. I think he's that, but I feel bad he's that. But he says the four-level enhancement, which is the thing we're talking about, is not something I would sentence him under. Well, he did. I mean, he did find the four-level enhancement. Right. He said, even though I found it. Right. Right. I'm in a very under, okay? Because I just, he's essentially saying, I just don't feel good about this. But the point is that, and the reason why this was so harmful is that he thought this man was a guy who was entitled to a four-level. That's like way up there. This is kingpin. This is kingpin territory up there, and he thought this guy's a kingpin, and he wasn't. This was a buyer-seller. He shouldn't have gotten the four-level, and if the judge had known he wasn't a kingpin of anything, he was a man in a store with customers, then the judge would have looked at this case entirely differently. And very likely, oh, I won't go farther than that. I see my time is up. Thank you. All right. You've got some time. Mr. Wilmot. May it please the Court, Counsel, my name is Trevor Wilmot, and it's my privilege to represent the United States in this case. Your Honor, I'd like to begin with the discussion on loss, since that seems to be where the Court spent most of their time, your time questioning Mr. Kwushu's attorney. Your Honors, the district court did not commit clear error in finding that the loss amount, reasonably estimated loss amount, to Mr. Kwushu's five-year SNAP fraud was approximately $5.2 million. The government argues that that was a finding that was based on specific and reliable evidence, as the law requires, and it was supported by that evidence here. And to begin with the guidelines and this concept of the government benefits rule, the government's interpretation of it is a simple mathematical formula at the end of the day. You take total SNAP, you less that by legitimate SNAP, and you're left with loss. And that was the method that was used here, because the question is, how do you factor legitimate loss? We knew that the total SNAP was about $5.4 million. The method used here by the government to determine legitimate SNAP was an average store comparison of four stores within a radius of Mr. Kwushu's KD Metro store, stores that were selected because there was no indication of fraudulent SNAP transactions at those stores, and stores that were selected because they were of a similar size, designation both in terms of the USDA's designation of a small category store and from the square footage of the store. And so, I'm sorry, go ahead. So Ms. Weill says, fine, but the stores you chose don't have any connection to the record in this case. Why sort of go so far afield? Why wasn't there something you could do with the evidence with respect to Mr. Kwushu's store itself? She said you had the bank records. Why isn't that a good place to start? Well, firstly, Your Honor, the record of what was at Mr. Kwushu's store, the KD Metro, was very sparse. While the search warrant was executed, there were no records, there were no receipts or invoices found. There was evidence in the record that over the course of the agent's surveillance, there was no deliveries. There was never a time that the agent saw stocking going on. So there was no way to reasonably arrive at an estimate of legitimate sales from Mr. Kwushu's own records. And what about the bank records? The bank records, I don't know in this record that we have them. There's a statement that the prosecutor said we have the bank records. Assuming that those bank records could have been analyzed, and I don't know the reason for that, but it's sort of besides the point, respectfully, because we're still trying to find a reasonable estimate of the loss at the end of the day. And given the state of Mr. Kwushu's affairs as they were when the search warrant was executed, I think it was reasonable under the circumstances and not clear error for the court to rely on the average stores. So yes, I guess I'm just curious, when I hear bank records, I guess I sort of like think of my own. And I'm wondering like what the bank records would have shown, sort of, maybe there's an easy answer to this. How would they have been able, how would you have been able to distinguish legitimate from illegitimate from bank records? Well, you know, I don't know. What are we talking about here, statements? You would have to make a lot, yes, assuming they are statements, I believe you'd have to make a lot of assumptions that Mr. Kwushu kept bank statements in, that the records would show clearly what was purchased and what was not. But what we know about the facts of the case from the search warrant is there's no indication that food was regularly being purchased at all. So there's no... I guess I'm thinking about my own Wells Fargo statement and it just says, you know, it might say, you know, EBT transaction at CVS for $67. But can you move from that to like what actually happened inside the store? That's what I'm trying to figure out. I don't know how you'd be able to make that calculation. Under a bank records theory, assuming that the bank records were to show purchases from a food wholesaler, I believe the theory would be you can take the aggregate of all of that bank statement activity in order to arrive at how much did Mr. Kwushu buy wholesale for the food. And we can use that to estimate the legitimate sales in the government benefits rule formulation. But compared to that, I don't think that the method employed by the government here, I don't believe there's clear error to show that it was not a reasonable estimate of the loss. It was based on specific evidence. The selection of the stores was intentionally made. Small stores nearby, no suspicion of fraud. Square footage wise and sales wise, they were reasonable comparators to Mr. Kwushu's store. And in addition to being specific, there was indication in the record that the number that was arrived at, approximately a little over $100,000 as the average of the stores over all of these years, that that number was reliable because the government, for lack of a better term, checked the math, right? Because they didn't just look at the average of these four stores, they looked at the whole numbers of these same four stores. So they're doing an average and then sort of a sum number. And then they're looking at, the government looked at and presented evidence of, the state average for other small stores and the national average for other small SNAP stores. And these numbers all show... Does the government benefits rule in section 2B1.1 contemplate looking at comparable stores? I don't believe the government benefits rule contemplates it. It's not explicit to say, look at comparable stores. All right. Ms. Wiles says it's a net loss method that's contemplated and the government benefits rule is required. The government disagrees, Judge Wilson. This court has never held in a government benefits fraud case and I'm unaware of any circuit court holding that the government must use an inventory type method to arrive at the loss amount. And indeed, there's a number of cases cited in the briefs in this case where courts have affirmed reasonable estimates that we're relying on average store comparison. Are we kind of dickering over terminology here? I mean, can we agree that a net loss methodology is required under the government benefits rule? And now let's talk about how do you arrive at net loss? She says you've got to use records. You say you can use comparative stores. I would agree with that, Judge Newsom. Again, I believe that the formula would be total SNAP minus legitimate SNAP equals net loss. And I believe that the question really is how are we getting at legitimate... How are we arriving at a reasonable estimate of legitimate SNAP? The government used an average of nearby stores and then checked that number against other stores in the area, in the state, in the country, and then Mr. Khrushchev's own estimate of what he believed he would sell. What Ms. Weil is presenting to the court is an alternative way to get at legitimate sales using inventory, using vendor analysis, using bank records. So there are two different ways to look at that same critical piece, Your Honor. And I believe that the alternatives presented by Ms. Weil don't establish that the method used here was unreasonable. In fact, the defendant's estimates would be less reliable and plainly not feasible if the district court were to use that method for loss in this case. Do you or does the government agree that ideally if Mr. Khrushchev had had spotless records, lots of invoices, lots of, you know, inventory, records of inventory, that that would be ideally a better way to reconstruct legitimate sales in a case like this? Respectfully, Judge Newsom, I don't think I could say that there would be one ideal versus another. I think it would have to turn on the facts of a particular case. If the bank records were to prove to be very... If they didn't show anything significant, if they were really vague, if there was, you know, a case where we really ought to focus on the vendor method or the inventory method or the bank records, that's not to say that it's not reasonable to use that method when it is available. I know, I believe there was a recent case here in the 11th Circuit, the Lulzigid case possibly where they looked at the vendor sales. They looked at the cost of goods sold, and that was a reasonable way to arrive at legitimate SNAP. But we don't have those facts here. So the government was searched for a way and found a reasonable way to arrive at a loss estimate with legitimate sales. The use of alternatives in this case, again, was not feasible, the government would argue. For example, Ms. Weil talks about the case of the interviewed witness, Ms. Tutman, who said that she had gone into the store, conducted about a $700 transaction of which $300 was for meat, and the remainder was split amongst her and Ms. Couchet. I believe it would be unreasonable to extrapolate from that one transaction that this was, that this proportion, that this number is what Mr. Couchet was engaged in over the course of five years. How many witnesses were there like her who gave this kind of testimony? Are we extrapolating from one witness or were there dozens or? Well, I believe that the PSR, Your Honor, said approximately a dozen witnesses were interviewed. However, the PSR also only talks about two or three witnesses specifically. But based on the record that we have, that the court has before it, the Tutman transaction, this $300 worth of meat, was an anomaly. There is, for example, Ms. Chupita, who says that she would typically get chips and a drink, and that was it when she was conducting these transactions at KD Metro. There's Ms. Starr, who said she would just get enough to make it look like she was buying something. The UC, who went into KD Metro approximately 18 times, and this is in the PSR as well, is conducting transactions for $200, say, and the agent's buying chips and a drink or something like that. I mean, very small amounts of food from the UC over this period of time and from the witnesses that we do know about. It's also consistent, Your Honors, with the testimony of the surveillance, the testimony about the surveillance. You'll recall the agent said that she had a computer that allowed her to look at SNAP transactions in real time, and she would see people go into the store with personal effects or nothing and come out with a small bag, something that, while the computer showed that there was a $200 to a $700 SNAP transaction, but there was clearly, in her opinion, there was nothing to suggest that a $300, that someone was buying several hundred dollars worth of food. Indeed, I would submit to the court that it's not reasonable to conclude or not reliable to conclude that Ms. Tutman purchased $300 worth of meat at that store. We know from the photographs and the testimony that it was, there was scarcely any food in the store. There was hardly any meat. It was expired. There was freezer burned. It was in unidentifiable bags. And given the state of the store at the time of the search warrant, it calls into question the veracity of Ms. Tutman's statement. And furthermore, for the government, had the government relied on Ms. Tutman's statement to arrive at Roth's loss, to extrapolate on this record, I think would have been unfair and unreasonable. Let me ask you this. Yes, sir. How do you get a supervisory role enhancement if you don't supervise anybody? Your Honor, this concept of supervisory authority and supervisory control is sufficient but not necessary to apply a role enhancement for organizing and leading. And the guidelines of this court's precedent tells us so. There are seven factors, as the court knows, in the commentary to the aggravating role. Only one of those is the degree of control and authority exercised over others. Indeed, there are other factors that don't deal with supervision. For example, the recruitment of others, the share of proceeds that are obtained in the offense. And what we know from- Who are the others now? They're buyers and Mr. Wushu is a seller? Is that what we have here, a buyer-seller relationship? No, Judge. I respectfully disagree that this is a buyer-seller relationship. What we have here are two people coming together to perpetrate a fraud and to steal from a third party. One of whom is a buyer and the other of whom is a seller? I would disagree with that respectfully, Judge Wilson, because no one's bringing anything. The intent on this transaction is to steal money from the government that neither of these two parties is entitled to or legitimately possesses. What I argue to the court, that these are people who brought in, had instruments that if combined, were allowed to create something of value. In a buyer-seller transaction, and first of all, the case law that's been cited in the brief is tailored to a drug context. Only one of the cases found that there was a buyer-seller relationship there and there was no role. That's all red. But here, no one's bringing drugs and money. There's no like-for-like exchange. It's not an exchange of a widget for a dollar. Well, assuming you're correct, how does he supervise the other perpetrators, the people who bring these food stamps in, these coupons, how is he supervising them? Judge Wright, he doesn't have to supervise them. He has to exert control or influence or leadership over them. There are all these other factors in the guidelines that are a proxy for determining whether one is an organizer and a leader. And there was no clear error here in the district court concluding that Mr. Khrushchev was an organizer or a leader. He planned and organized the offense. He was in the position to—he had access to the point-of-sale system. He was the one that every SNAP holder had to come to to conduct one of these transactions. And significantly, he reaped the whirlwind of the profit. And to the extent, Your Honor, that there was any error here, clear error here, in the application of the role—and the government argues there was not any error, of course, it was harmless on this record—it's clear that Judge Jones intended, while he applied the four-level enhancement for role, it's clear that he intended to, and did, vary downward by the four-level enhancement and sentence Mr. Khrushchev without regard to the role enhancement. And if there are no other questions from the court, the government will rest on its breath. All right. Thank you, counsel. We'll hear from Ms. Weil. The only thing I'll say about role, Your Honor, is not only do you have to supervise the other participants, but those seven factors that the prosecution is discussing don't have anything to do with this. They are done to determine whether you will get four levels or whether you get two levels. That was what that commentary is about those factors. I wanted to ask you about bank records. I've been sitting here thinking about what you had suggested concerning bank records. Bank records could show purchases of inventory. Bank records in an honestly run business could also show daily deposits from the business. Do we know what your client did once he made one of these illegal transactions? For example, the woman who said she bought $300 worth of food from $700, and I think she split the remaining $400 with your client. That was her testimony. Is there anything in the record to indicate what he did with that $200? He might not have made a deposit of that. He might have put it in his pocket and taken it home for the day. No, Your Honor. It would be speculative. So how would bank records be helpful? Bank records might show inventory, but it might not actually show the transactions. Bank records are absolutely what was relied on in many cases, several of which I cited to Your Honor. You know, my bank records, I'm talking about my bank records. They show my checks. It shows who I wrote it out to. Sometimes even online, it will show who the check wrote out to. It will also show my credit cards and debit cards where the vendor is. And that's what they did in Hussain, Ali, Haddad. All these cases, they relied on bank records. And let me point out, Your Honor, that no case has ever had a comparative store method and just said, well, that's it, we're going to compare the stores. I think more in answer to your question, Judge Wright, is that the comparative store method in this case only told you EBT sale transactions, period. They were comparing the number of EBT sale transactions. It wasn't giving anybody any credit for some of them were legitimate. It was only giving him credit for, well, he didn't have as many. The only way that any case, and I've cited them all in my brief, have been able to come up with a loss amount that is fair and has anything to do with the case, is when they subtract out legitimate sales from bank records. You just look, if he only has $5,000 worth of vendor's transfers, so what? That's what he gets. But in this case, it's significant because A, it wasn't factored out at all, nobody bothered to look, and they worked really hard in these other cases. It's hard. It takes work. But you have to do it to send somebody to jail for more time than they otherwise would. And also, I really want to point out to Your Honor the importance of the sentencing factor manipulation. This was $3,000. It was over 60% of all the fraud in this case was passively while the agents were sitting around long after they knew this had happened. I'm not saying they did anything objectively that would cause this to thwart the prosecution. They weren't horrible for waiting. The point is, you're not supposed to sentence somebody based on that passive time where we're sitting around and we think we'll do about 18, 18 transactions on this little store. They could have closed them down, boom, March 2018, would have saved . . . The problem for you is we've got an opinion in United States v. Lange where we said that the government doesn't have to arrest after a single illegal transaction. And I agree. It's not that we should shut down this case and say, no, the prosecution isn't good. But to be fair, let's look at what happened. After 18 transactions, then they waited 17 more months while this stuff just kept ratcheting up. Not only was the judge upset, you'll see in the transcript the judge was saying, well, I don't really like the fact that this is still going on. You know, why didn't y'all close this thing down? I mean, it was bad for the government because it took out an extra $3 million, but it really popped this man because it caused him to go to jail for much longer, and that's just not fair. And the purpose of sentencing factor manipulation is to be fair. And that was what we had asked Your Honor to do and ask Your Honor to reverse in this case. Thank you. Well, thank you very much. And the case was very well argued, and Ms. Wild, the court thanks you for your service.  Thank you. Thank you. We'll move on to the next case then.